UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| FRANCIS LOVE, | ) | CIV.  04-5098-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND |
| | ) | REMANDING THE |
| JO ANNE B. BARNHART, | ) | COMMISSIONER'S DECISION |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Francis Love, moves for reversal of the Commissioner of
Social Security's decision denying his application for disability insurance
benefits and supplemental security income under Titles II and XVIII of the
Social Security Act.  Defendant opposes the motion.  The court reverses and
remands the Commissioner's decision denying benefits.

**FACTS**

Love was born on April 18, 1950.  He attended Poudre High School in
Fort Collins, Colorado, where he completed the eleventh grade on May 30,
1968.  Although he never finished high school, he completed some welding
training in January of 1976.  He had below average grades throughout his
academic career and had particular difficulty with math.  After quitting
school, Love enlisted in the U.S. Navy.  He attempted and failed to pass the

GED twice while in the Navy.  His work in the Navy lasted from 1969 until 1974.  During his service, he trained as a boiler operator.  In 1981, Love attended Laramie County Vo-Tech in Fort Collins, Colorado, where he successfully completed a one-year training program in welding.  In 1991, he participated in GED preparatory classes in Hot Springs, but continued to have difficulties with math and did not attempt to take the GED again.  (SR. 88-100).

   After his work in the Navy, Love worked as a laborer, an underground miner, a seasonal worker, an assembly line worker, a garbage truck driver, and a cab driver.  Beginning in 1992, he was employed as a tractor-trailer truck driver for the Hot Springs Oil and Gas Company in Hot Springs, South Dakota.  He worked full time and was paid 22 cents a mile resulting in earnings of approximately $400 per week.  His duties consisted of picking up gasoline at refineries in North Platte or Sidney, Nebraska, and delivering it to gas stations.  He drove over 2,000 miles per week and was required to handle 50-pound hoses to load and unload his truck.  He also completed maintenance work on his truck.  Love was injured on September 28, 1996, and quit work on October 17, 1996, when he became physically unable to perform his duties due to his injury.  Since that time, he has conducted job searches through South Dakota Job Service, employer contacts, and filling out job applications, but has remained unemployed.  (SR. 88-100).

2

Love injured his back, neck, and left shoulder, and suffered a severe contusion to the top of his head in the work-related motor vehicle accident on September 28, 1996. His medical records reflect permanent physical impairment to his upper left extremity and restriction to light sedentary work. He claims that the duties aggravated his back, neck, and left shoulder to the extent that he had to quit his job. Shortly after Love's motor vehicle accident, he was diagnosed with throat cancer and underwent a laryngectomy at the Veterans Administration Hospital in Minneapolis, Minnesota. He now has a stoma and uses an electronic larynx which enables him to speak. (SR. 88-100).

On October 17, 1996, Love saw Dr. Victoria Andersen, who noted that Love had struck the top of his head on the cab of his truck during the motor vehicle accident. Love reported developing pain in his neck area and between his shoulder blades subsequent to the accident. Dr. Andersen noted that Love had a shooting sensation going down his left arm, pain in the top of his left shoulder, and a numbness in his left hand. Dr. Andersen recommended a CT scan concerning the numbness in the left hand, but was not concerned about the other pain as it was musculoskeletal-type pain. On October 28, 1996, Dr. Andersen reported that Love had a severe contusion on the top of his head and muscular pain in his neck and back area. (SR. 89).

3

On December 5, 1996, Love was examined by Dr. Dale Anderson who reported that Love complained of chronic headaches and shooting pains from his head and neck region into both shoulders.  Love had an apparent weakness of muscle strength on the left side and chronic pain radiating from his neck to his shoulders.  Dr. Anderson recommended that Love undergo a cervical MRI scan to rule out a soft-tissue injury and disc problem and that Love participate in physical therapy. (SR. 90).

On December 27, 1997, Love saw Dr. Dale Anderson.  Love complained about his headaches and Dr. Anderson reported that if chiropractic treatment did not improve Love's symptoms, there was little he could do other than a possible neurological evaluation.  From January 3, 1997, through June 12, 1997, Love received approximately nineteen chiropractic treatment sessions from Dr. Venekamp in Hot Springs, South Dakota.  On March 6, 1997, Love reported to Dr. Anderson that his pain and symptoms had markedly increased.  He complained of severe headaches, left shoulder pain, and muscle tightness and soreness.  On April 15, 1997, Dr. Anderson examined Love and noted that his shoulder pain was still present and that Love also had a new problem in his left buttock and low back region.  Anderson noted that it appeared to be a sprain and a strain and that exercises would help decrease his symptoms. (SR. 90).

4

On May 15, 1997, Love again visited Dr. Anderson.  At that time, Love was using a transcutaneous electrical nerve stimulator (TENS unit) on his neck and shoulder, which made his symptoms tolerable.  Love complained of chronic headaches and pain in his neck and shoulder on a daily basis and of pain in his low back in the S-1 region.  On June 13, 1997, Dr. Anderson expressed his concern about Love's constant thoracic pain.  Dr. Anderson opined that the pain was muscular in origin and that no additional treatment was needed.  Dr. Anderson stated that the condition was permanent.  (SR. 359).

On July 22, 1997, Love saw Dr. Goff, a physiatrist in Rapid City.  Dr. Goff stated that Love's symptoms had stabilized.  Dr. Goff also noted that Love's symptoms were aggravated by static and overhead activities and that his symptoms were increased by prolonged bending and re-extending type activities as well as heavy lifting.  Dr. Goff assessed Love as having injuries at multiple levels including at the tracheal lumbar junction, the S-1, the T-4, and the mid and upper cervical spine.  Dr. Goff also suggested that Love might be experiencing a mild intermittent carpal-tunnel syndrome in his left hand.  (SR. 91).

On June 13, 1997, Dr. Anderson stated that Love suffered a 25 percent permanent partial impairment to his left upper extremity.  Dr. Anderson noted that Love had no specific objective factors of

impairment.  On June 9, 1997, Love underwent a functional capacity assessment at the Black Hills Rehabilitation Hospital in Rapid City.  This assessment indicated that Love could engage in light sedentary work for an eight-hour day.  The assessment recommended the following restrictions for Love:  occasional lifting at various levels up to 10 pounds; carrying 15 pounds; pushing and pulling 20 pounds; occasionally bending, reaching, climbing, and kneeling; light use of arm controls; no squatting or crawling; and frequent sitting, standing, and walking.  On February 27, 1997, Dr. Venekamp indicated that Love had the following restrictions: lifting from 10 to 20 pounds; repetitive lifting or carrying from 0 to 10 pounds; and no repetitive overhead reaching, carrying, lifting, and stooping.  On March 6, 1997, Dr. Anderson stated that Love could work as a truck driver without any heavy lifting or unloading. (SR. 91-93).

On June 13, 1997, Dr. Anderson indicated that Love's residual functional capacity (RFC) assessments had been completed on June 9, 1997.  Love was restricted to light sedentary work.  Anderson related that Love had previously been employed as a truck driver delivering fuel and that Love was required to lift hoses that still had fuel or liquid in them. Anderson stated that lifting the hoses exceeded Love's lifting limits as recommended by his RFC assessments, and that Love should search for light sedentary type of work.

6

On January 7, 1997, Love completed a General Aptitude Test Battery at the South Dakota Job Service.  The scores suggested that it is doubtful that Love would have the cognitive aptitudes necessary to complete a post-secondary formal retraining program at a vocational-technical school or college.  Additionally, the record indicates that there are no training sites in Love's geographic area. (SR. 97)  Love's psychomotor scores ranged from below average to low average.  Love's motor coordination score fell below the fourth percentile, and his manual dexterity score fell below the first percentile.  The assessment states that the low scores are consistent with Love's permanent physical impairment to his upper left extremity.  Based on these scores, it was determined that Love would not be a suitable candidate for occupations requiring proficient motor skills, especially in a production-type setting.  (SR. 97)

On November 3, 1998, Love saw Dr. Goff who determined that Love has experienced injury to the cervical, dorsal, and lumbar areas and would qualify as having minimal impairment of 5 percent in each area.  (SR. 309).  On January 10, 2000, Dr. Goff determined that Love had good strength, but that his symptoms were more consistent with a thoracic outlet type of condition than a cervical radiculopathy, although Love was a candidate for both.

For pain, Love takes Darvon, ibuprofen, Tylenol with codeine, acetaminophen with codeine, and propoxyphene. Love also takes methocarbamol as a muscle relaxer, guaifenesin to keep his lungs clear, and leuothyroxine for thyroid control. His side effects from the medications include drowsiness and coughing. He also uses a TENS unit on a daily basis to manage pain. On April 30, 1998, Love was given a prescription for a cane by Dr. Hafan Achtar, a general practitioner at the Veterans Administration Hospital in Hot Springs, South Dakota. Apparently, Love complained his left leg had been giving out frequently, and the cane helped him maintain his balance and prevented him from falling. (SR. 88-100).

On May 16, 2000, Beverly Blackwell, a Veterans Affairs counselor, determined that Love qualified for VA disability. Fatigue resulting from pain appeared to limit Love's performance levels. Love required extensive remediation prior to any training program based on his lack of high school diploma, GED, and ability to understand algebra. A vocational assessment completed by Independent Vocational Counseling on May 14, 1998, is consistent with the findings of unemployability. The report did not take into consideration his limitations resulting from the laryngectomy that further impact his employment opportunities. Based on a total assessment, Blackwell found Love was unemployable. Factors included in the decision included the severity of his physical limitations, severe problems in

8

communicating with others due to the laryngectomy, his low cognitive abilities, lack of transferable skills into a sedentary to light position, his age, his inability to meet the requirements of a formal academic program in order to be retained, his low tolerance levels toward fatigue and pain, and his lack of a GED or high school diploma.  No jobs could be identified by Blackwell that met his extensive limitations.  Furthermore, Blackwell noted that Love is not a suitable candidate for a program of vocational rehabilitation or formal retraining due to his lack of formal education, low cognitive aptitudes, and his functional limitations and chronic pain. (SR. 373-74)

A physical RFC assessment was completed by Dr. Larry Vander Woude on May 21, 2003.  The assessment showed that Love could lift 20 pounds occasionally and 10 pounds frequently.  He could stand and/or walk for a total of about six hours in an eight-hour workday.  Love could sit for about six hours in an eight-hour workday.  His ability to push and/or pull was unlimited.  There were no postural limitations.  Love was limited in his ability to reach with his left hand.  Dr. Vander Woude found that Love had no visual, communicative, or environmental limitations.  (SR. 150-55).

Michael Roberds, a friend of Love, and Abbott, Love's son, reported witnessing Love's fatigue, irritability, shortness of breath, low levels of energy, and hearing Love complain of pain.  Roberds explained Love's fatigue constantly interferes with his attention and concentration. Abbott

explained that Love can only walk one and a half blocks before needing to stop and catch his breath for fifteen to twenty minutes.  Both Roberds and Abbott reported that Love can sit or stand for no more than thirty minutes at a time, and can sit, stand, or walk for a total of no more than two hours a day.  They also explained that Love walks every twenty minutes for about fifteen minutes at a time and can lift and carry between 5 and 10 pounds. Roberds estimated that Love has approximately three bad days in a month, but Abbott estimated that every day is a bad day for Love.  Abbott also explained that Love uses a cane to walk when his hips give out or when his back starts to hurt and that Love cannot be around fumes, dust, or temperature extremes due to his breathing problems.  (SR. 137-144).

At the hearing on February 24, 2004, Love testified that he can walk approximately a block and a half before losing his breath.  He estimated that he is able to sit between fifteen and twenty minutes at a time.  Love also estimated that he could sit for a total of three or four hours in an eight-hour work day.  He explained that he could stand for fifteen or twenty minutes at a time on average and that he could stand for a total of about four and a half to five hours in an eight-hour work day.  He also testified that his leg gives out two to four times every day and that it sometimes causes him to fall to the left.  Love testified that he can lift up to 25 pounds with both hands, but only 15 pounds with his left hand.  He explained that

he was able to vacuum and wash dishes for about ten minutes at a time. Love testified that his typical day involved getting up at 6:30 a.m., getting his three-year-old grandson ready for school, and then doing the dishes. After the dishes, Love takes a nap for half an hour to an hour. He then gets up and does other things around the house including laundry, dishes, and vacuuming. At 4 p.m., Love lies down again to relieve the pain from standing and sitting during the day. Although Love used to enjoy swimming, boating, hunting, and fishing, he explained that he no longer participates in those activities due to his injuries. Love testified that his social life is limited to visiting his daughter who also lives in Hot Springs, South Dakota. (SR. 446-62).

William Tysdal, a vocational expert (VE), testified that the skill level for Love's previous work as a tractor/trailer truck driver is semi-skilled and that the exertional level is medium. He also testified that the skills from the tractor/trailer truck driver would transfer to light work, but not to sedentary work. He expanded by stating that light work using such skills would include a parking lot attendant and a rental car deliverer. Tysdal testified that the vocational adjustments in transferring from a tractor/trailer truck driver to an attendant or deliverer would be a mild vocational adjustment. He also explained that there are about 40,000 parking lot attendant jobs nationally and 800 regionally and that there are 25,000 deliverer jobs

11

nationally and about 300 regionally.  In response to the ALJ's hypothetical question, Tysdal testified that "[t]here would be light work that, light, unskilled work that, that the [Love] could perform.  I think the transferable jobs, probably because of the heat and cold extremes, would be, would be eliminated."  Tysdal also testified, however, that there would be light jobs, with a sit/stand option available to such a person.  He listed electronics worker, small products assembler, and a production assembler.  Tysdal expanded stating that "For the most part these jobs would allow for, you know, the visual observation of use of the hand.  As long as, as long as he was able to function with that hand, I think it would not effect [sic] my opinion."  The ALJ then asked, "[n]on use of the hand would eliminate the jobs?"  To which Tysdal responded, "I believe so, yes.  It would require bimanual dexterity."  The ALJ then said, "Well, I note that the claimant's description of his limitations could be no better than sedentary work to which skills do not transfer, at age fifty it would mandate a finding of disability."  Tysdal further testified that Love's low manual dexterity would lower his chances of being successful on assembly jobs.  His low scores, however, would not preclude the job because of the ability to improve such aptitudes. (SR 462-68).

## ALJ DECISION

Love filed an application for disability insurance benefits on March 19, 2003.  He alleged disability beginning October 17, 1996.  The claim was denied initially and on reconsideration after which a timely request for a hearing was made.  The hearing before the ALJ took place on February 24, 2004.  Love appeared and testified at the hearing.  Tysdal also appeared and testified at the hearing.  The ALJ issued an unfavorable decision on April 1, 2004, stating that Love was not disabled because he maintained the RFC to perform a range of sedentary work.

After applying the sequential five-step evaluation process,[1] the ALJ concluded that Love was not entitled to benefits.  First, the ALJ determined that Love was not engaged in substantial gainful activity.  Second, the ALJ found that Love suffered from status-post laryngectomy, chronic neck, left shoulder, and left hip pain, and chronic obstructive pulmonary disease

--------

[1]The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

(emphysema or chronic bronchitis that is characterized by chronic typically irreversible airway obstruction resulting in a slowed rate of exhalation)(COPD).  The ALJ determined that the impairments were severe, but that under the third step the impairments did not meet or equal the Listing of Impairments at 20 C.F.R. Pt. 404, Appendix 1, Subpart P, Regulation 4.  Fourth, the ALJ determined Love's RFC by reviewing medical records and testimony of witnesses.  The ALJ concluded that Love could sit for fifteen to twenty minutes at one time and for three to four hours in an eight-hour workday.  He also determined that Love could stand for fifteen to twenty minutes at one time and for four and a half to five hours in an eight-hour workday.  The ALJ also found that Love could lift 20 to 25 pounds with both hands, but only 15 pounds with his left hand.  It was also noted that Love has problems with his left leg giving out two to four times a day and that Love has fallen in the past due to this problem.  Based on those conclusions, the ALJ found that the medical evidence supported the severe impairments and that Love retained the RFC to perform sedentary to light exertional level work where he can use a hand-held vibratory device to speak, and where he can avoid temperature extremes and noxious fumes. Because the vocational expert (VE) testified that Love's past work as a tractor/trailer truck driver constituted semi-skilled, medium exertional level work, the ALJ found that Love is unable to return to his past relevant work.

14

The VE also testified that Love retained the ability to maintain sedentary to light exertional level work as an electronics worker, a small parts assembly worker, or a production assembler.  Love's application was therefore denied at the fifth step of the evaluation process based on VE testimony regarding his ability to make a successful adjustment to work that exists in significant numbers in the national economy.  (SR. 17-25)

On September 17, 2004, Love requested review of the Step Five denial of benefits and attendant medical insurance benefits.  Love claimed that the ALJ failed to include in his consideration of impairments back pain, permanent tracheostomy, severe headaches, emphysema, left arm pain, hypothyroidism, and first and fourth percentile scores in manual dexterity and motor coordination respectively.  Love also claimed that the ALJ failed to consider Love's 100 percent service-connected disability status since 1998 and that the ALJ did not explain why he discounted the statements of William Peniston, a vocational expert.  Love argued that in determining his RFC, the ALJ failed to include all of Love's limitations regarding his ability to communicate (such as the loss of battery charge in his electro-larynx) and that Love is required to lie down two to three times per day in order to manage his pain symptoms.  Love also argued that the ALJ failed to bring out facts regarding Love's transferable job skills.  The request for review was denied on October 5, 2004.  (SR 17-25).

15

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); <u>Metz v. Shalala</u>, 49 F.3d 374, 376 (8th Cir. 1995).  Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion.  <u>Fines v. Apfel</u>, 149 F.3d 893 (8th Cir. 1998); <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995); <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1346 (8th Cir. 1993); <u>Locher v. Sullivan</u>, 968 F.2d 725, 727 (8th Cir. 1992); <u>Turley v. Sullivan</u>, 939 F.2d 524, 528 (8th Cir. 1991).

Under § 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to re-weigh the evidence or try the issues de novo.  <u>Murphy v. Sullivan</u>, 953 F.2d 383, 384 (8th Cir. 1992).  Furthermore, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision."  <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).  <u>See also</u> <u>Smith v.</u>

<u>Shalala</u>, 987 F.2d at 1374.  The court must review the Commissioner's decision to determine if an error of law has been committed.  <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); <u>Nettles v. Schweiker</u>, 714 F.2d 833, 836 (8th Cir. 1983).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  <u>Smith v. Sullivan</u>, 982 F.2d at 311; <u>Satterfield v. Mathews</u>, 483 F. Supp. 20, 22 (E.D. Ark. 1979), <u>aff'd per curiam</u>, 615 F.2d 1288, 1289 (8th Cir. 1980).  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently.  <u>Smith v. Shalala</u>, 987 F.2d at 1374.

## DISCUSSION

Love argues that the ALJ did not properly consider Love's 100 percent service-connected disability rating completed by the VA effective March 18, 1998.  The Commissioner  argues that the ALJ is not bound by the disability determinations of other agencies.  These arguments are not mutually exclusive.  Although the ALJ was not bound to the VA determination of total disability, the ALJ should have given the VA determination some weight:

> It is true that "the ALJ does not have to discuss every piece of evidence presented . . . ."  It is also true that a disability determination by the VA is not binding on an ALJ considering a Social Security applicant's claim for disability benefits.  We think, however, that . . . VA finding[s are] important enough to

> deserve explicit attention.  We agree with other courts that
> findings of disability by other federal agencies, even though they
> are not binding on an ALJ, are entitled to some weight and
> must be considered in the ALJ's decision.

Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998) (citing Miller v. Shalala,

8 F.3d 611, 613 (8th Cir 1993)); Jenkins v. Chater, 76 F.3d 231, 233 (8th

Cir. 1996); see Wilkins v. Callahan, 127 F.3d 1260, 1262 (10th Cir. 1997),

Baca v. Department of Health & Human Servs., 5 F.3d 476, 480 (10th Cir.

1993), Fowler v. Califano, 596 F.2d 600, 603 (3d Cir. 1979).  The

Department of Veterans Affairs determined that Love was fully disabled

because of his status post laryngectomy.  "If the ALJ was going to reject the

VA's finding, reasons should have been given, to enable a reasonable review

by the court." Morrison, 146 F.3d at 628.  The ALJ failed to mention or give

any consideration to the VA determination.  That failure constitutes

reversible error.

Love also claims that the ALJ erred in failing to identify all of Love's

severe impairments at Step Two, namely, his back and left arm pain,

fatigue, hypothyroidism, and chronic headaches.  The Commissioner

contends that the ALJ expressly considered back and left arm pain as well

as motor coordination and manual dexterity deficits.  The Commissioner

also contends that Love did not allege or establish that hypothyroidism

resulted in an impairment, that chronic headaches are not supported by

objective medical evidence, and that fatigue is a symptom and not an

18

impairment and therefore should not be listed as an impairment.  At Step
Two of the sequential evaluation, the ALJ should identify all severe
impairments of the claimant.  Baker v Apfel, 159 F.3d 1140, 1143 (8th Cir.
1998).  An impairment is severe if it has more than a minimal effect on a
claimant's ability to do work.  See Johnston v. Apfel, 210 F.3d 870, 874 (8th
Cir. 2000).  The Social Security Regulations (SSR) state: "Your symptoms,
such as pain, fatigue, shortness of breath, weakness, or nervousness, are
considered in making a determination as to whether your impairment or
combination of impairment(s) is severe."  20 C.F.R. § 404.1529(d)(1).  Any
symptoms of a listed impairment should then be considered to determine
"whether your symptoms, signs, and laboratory findings are at least equal in
severity to the listed criteria.  If it does not, [then] we will consider the
impact of your symptoms on your residual functional capacity."  20 C.F.R.
§ 404.1529(d)(3).   Thus, at the very least, the ALJ was required to give
consideration to the impact of symptoms on Love's RFC.

       With regard to Love's back and left arm pain, the ALJ's decision
makes reference to Love's use of a cane due to back pain and also describes
Love's complaints about pain in the upper left scapular area.  (SR. 21).  The
decision also contains some discussion of the possibility of carpal tunnel in
Love's left hand and that Love has a 25 percent permanent partial
impairment of the left upper extremity.  (SR. 20).  Back and left arm pain,

however, were omitted from the ALJ's list of Love's severe impairments and were not expressly considered in determining the RFC.  Also omitted from the list of impairments considered in determining the RFC are Love's hypothyroidism and severe headaches.  Descriptions of Love's hypothyroidism and his severe headaches appear in the record, (SR. 298, 164), but no discussion of either condition appears in the ALJ's decision.

Consideration of fatigue is also missing from the ALJ's analysis of Love's RFC.  While the court agrees with the Commissioner that fatigue is a symptom caused by an impairment and not an impairment in and of itself, the inquiry should not end there.  The ALJ failed to discuss fatigue in determining Love's RFC.  The record includes evidence of Love's fatigue and evidence of Love's hypothyroidism which can exacerbate fatigue.  (SR. 302, 298).  See Merriam Webster Medical Dictionary available at www.intelihealth.com (defining hypothyroidism as deficient activity of the thyroid gland and a resultant bodily condition characterized by lowered metabolic rate and general loss of vigor).  Commissioner claims that Love's alleged fatigue is undermined by his reports of feeling "good" to his physicians.  But Love's reports of "feeling better" or "feeling good" should be read as statements relative to a person suffering from the same ailments.  The fact that someone may have felt "good" for a person who suffered all of Love's impairments does not support or contradict a finding of disability.

20

See Fleshman v. Sullivan, 933 F.2d 674, 676 (8th Cir. 1991) (illustrating that someone can "feel better" after a kidney transplant, but still qualify as disabled).  Likewise, a subjective reading of Love's statements would be appropriate here.

Love also claims that the hypothetical question posed to the ALJ did not precisely describe the entirety of Love's impairments.

> Unless the hypothetical question comprehensively describes the limitations on a claimant's ability to function, a vocational expert will be unable to accurately assess whether jobs do exist for the claimant.  Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.

Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994) (citing Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir. 1990)).  The ALJ cannot assume the VE remembers all of the claimant's impairments from the evidence.  Newton v. Chater, 92 F.3d 688, 695 (8th Cir. 1996).  To that end, the hypothetical question should include an explicit statement of the claimant's impairments.  Id.  Anything less will not constitute substantial evidence.  Id. "A hypothetical question, however, need only include impairments that are supported by the record and which the ALJ accepts as valid."  McKinney v. Apfel, 228 F.3d 860, 865 (8th Cir. 2000).

Because the ALJ improperly failed to consider whether Love's back and left arm pain, fatigue, hypothyroidism, and chronic headaches were

severe impairments or symptoms that affected Long's RFC, the court cannot determine whether the hypothetical question included all limitations on Love's ability to function.  Thus, the testimony elicited in response to the hypothetical question does not constitute substantial evidence to support the Commissioner's decision.

**CONCLUSION**

The ALJ improperly omitted consideration of the VA's disability determination, failed to discuss all of Love's severe impairments, and posed an incomplete hypothetical question to the VE.  Because of these errors, the Commissioner's decision is not supported by substantial evidence.  Accordingly, it is hereby

ORDERED that the decision of the Commissioner of Social Security denying Love's claim for disability insurance benefits under Titles II and XVIII of the Social Security Act is reversed.  This case is remanded to the Commissioner for further consideration consistent with this opinion.

Dated July 13, 2005.

BY THE COURT:


*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

22